THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EDDIE HUDSON, Defendant-Appellant.

First District (2nd Division)    No. 80-1106

Opinion filed November 24, 1981.

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Casimir J. Bartnik, and Richard T. Sikes, Jr., of counsel), for the People.

JUSTICE DOWNING delivered the opinion of the court:

Defendant Eddie Hudson was charged in a four-count information with the murders of two men. A jury found defendant guilty of two counts of murder. Although defendant was eligible for the death penalty, the trial court found sufficient mitigating factors, and instead sentenced defendant to an extended term of 45 years.

Defendant claims (1) that the evidence did not prove him guilty beyond a reasonable doubt; (2) certain remarks of the assistant state's attorney during closing argument deprived him of a fair trial; and (3) the trial court abused its discretion in entering an extended term sentence.

On December 6, 1977, Jimmy and Willie Ewing were shot to death and Roy Woods was injured at a Chicago location. Defendant was arrested and brought to trial for the Ewing murders.

James Clark, the State's first witness, testified that on the night of the shootings, he had finished work and proceeded to Big Man's Liquor Store, 5648 S. Halsted, Chicago, at about 1 a.m. He sat in his pickup truck across the street on the east side of Halsted for one-half hour, listening to the radio. His friend, Tommy Larry, came by. Clark and Larry bought some beer at Big Man's and sat drinking it at the tailgate of Clark's truck.

During this time, three men walked by, coming from the north. One of them slapped Larry on the shoulder and spoke a few words to him. Clark did not see the men's faces at that time. The three men continued south on Halsted, crossed the street, and then turned north on the west side of Halsted. Clark saw the men walk up to a hallway located next to Big Man's. He heard shots and saw one of the men firing a gun into the hallway. Four or five shots were fired, and then the men ran. One of them crossed Halsted and passed within five feet of Clark. At trial, Clark identified this man, the one who had done the shooting, as defendant, and

related that defendant was wearing a black turtleneck sweater and grey trousers on that night. Defendant fled past Clark and turned east into an alley on Clark's side of Halsted.

On cross-examination, Clark stated that he did not pay attention whether there was anyone else on the street when he first arrived at Big Man's. He was not looking at the liquor store as he sat in the truck. He might have seen one or two people go into the store during that time. Clark could see the hallway from his truck and did not see anyone enter or leave it. He did not see anyone pushed into the hallway. The first time he saw the three men was when they passed him on the street. After the attack, Clark saw Roy Woods, a victim of the shooting, lying in the hallway.

Woods testified tht he met Jimmy and Willie Ewing and two other men outside of Big Man's at about 1 a.m. on December 6, 1977. As the men talked, two men walked up to Willie Ewing. Woods did not pay attention to their conversation. Woods identified defendant as one of the two men. He was wearing a black turtleneck sweater.

Woods later noticed that defendant and the other man had left. About five minutes later, defendant returned with two others. Woods was standing next to the hallway near the store. One of the three pushed Woods into the hallway. Woods fell on the steps and started to get up. Woods could see defendant's face, since he was only six feet away. Woods then saw that defendant had a gun, and he stepped back. Defendant raised the gun and pointed it at Woods. Woods raised his arms up, and defendant fired a shot. The bullet hit his left forearm, and the impact spun him around. Woods fell on his face. He then heard the "constant repeat of fire." He felt Jimmy Ewing's body hit his, and felt it jerk several times. Jimmy hollered, "aw, man." Woods thought he heard five shots while he was down. He then heard the gun click and looked up. Defendant was pointing the gun down at him and the Ewings, and it clicked three more times.

Woods then saw defendant turn around and run across the street holding the gun in the air and saying something. Defendant ran across Halsted in a northeast direction, turned north, and cut through a gangway on the east side of the street. A man then ran across the street to Woods. Woods later learned that the man was James Clark.

On cross-examination, Woods stated that he did not remember seeing anyone else on the street during the time. There was a light at the top of the hallway into which he was pushed. He did not pay attention to the initial conversation between defendant and Willie Ewing. Three or four minutes elapsed between when Woods was pushed into the hallway and when the shooting started. Woods recalled that defendant and the two others had approached him from the south.

The State called several other witnesses whose testimony is not considered relevant to the issues raised on this appeal.[1] The sole evidence presented by the defense was the stipulated testimony of a toxicologist, which reflected that examiner's findings as to the level of alcohol found in the bodies of the shooting victims.

The State and the defense then proceeded to present closing arguments. During the State's rebuttal argument, the assistant state's attorney made comments which are the subject of one of defendant's contentions on this appeal. The content of those statements will be discussed more fully in the analysis of defendant's claim. The jury returned guilty verdicts on two counts of murder.

I

Defendant claims that the evidence did not prove him guilty beyond a reasonable doubt of the murders of the Ewing brothers because of discrepancies and contradictions in the testimony of the two eyewitnesses; and because of the asserted lack of credibility in those witnesses' identifications of defendant due to the allegedly suggestive one-photo showup of defendant.

We do not believe any purpose would be served by further restatement of the testimony of witness Clark and victim Woods, or by further analysis of the alleged or obvious differences in their stories. Careful scrutiny of the evidence convinces us that the jury had sufficient facts upon which to base a valid conviction of defendant. Most notably, and very briefly, the testimony of Clark and Woods as to the events of December 6, 1977, is remarkably similar in all salient points. Additionally, both had clear opportunities to closely view the assailant who fired the gun, and both identified defendant as that person, without question in their minds. Defendant's argument on this issue is, as noted by the State, essentially a rehash of the closing argument. That argument did not convince the jury, and nothing in it creates, in our judgment, a reasonable doubt of defendant's guilt.

■■ ■ Defendant does focus special concern upon the effects of the photographic showups of defendant made to both Clark and Woods soon after the occurrence. We note that defendant filed pretrial motions to suppress the identification testimony of these witnesses on this ground. The trial court refused the requested suppression, and defendant does not contest that result here. Consequently, defendant has conceded that, as a matter of law, the photo showups were not so unduly suggestive as to require suppression of the viewers' testimony. It was thus a question of

---

[1] Other State's witnesses included the coroner who autopsied the victims and reported thereupon; the victims' sister, who related their last known living whereabouts; an expert who examined bullets related to the murders; and the Chicago policeman who arrested defendant.

fact for the jury to decide whether the identification testimony of Clark and Woods was rendered noncredible because of the circumstances of the showups. In his closing arguments, defendant's attorney stressed this point to the jury. Evidently, the jury was not impressed with defendant's position on the matter.[2] In such circumstances, where the evidence clearly demonstrates defendant's guilt, this court will not overturn the fact-finder's evaluation of the evidence. On this record, there does not exist a reasonable doubt as to defendant's guilt.

## II

Defendant argues that various parts of the State's rebuttal to his closing argument deprived him of a fair trial.

### A.

During rebuttal, the assistant state's attorney made the following comments:

"ASA: When we started this trial, you were told that the defendant is presumed to be innocent until we, the People, show different. And once we begin to call witnesses to the witness stand, what happens is that the presumption begins to part.

Df: Objection, Judge.

Ct: Sustained."

■■ Defendant correctly states that the presumption of innocence remains with him at all stages of trial, and that this comment of the assistant state's attorney was therefore highly improper. (*People v. Balls* (1981), 95 Ill. App. 3d 70, 77, 419 N.E.2d 571; *People v. Wilson* (1981), 92 Ill. App. 3d 370, 381, 415 N.E.2d 1315.) However, the court instructed the jury carefully as to the proper status of defendant's presumption of innocence. The court also immediately sustained defendant's objection to the statement. The assistant state's attorney's interjection of this statement into the proceedings was glaringly improper. However, given the corrective measures taken and considering the great weight of the evidence demonstrating defendant's guilt, we decline to reverse defendant's conviction on this ground. See *People v. Balls*.

### B.

During rebuttal, the assistant state's attorney told the jury that he could not ask the police officer who testified what the officer had heard

---

[2] Defendant's reference to *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967, is of no value to his contention. In *Simmons*, the Supreme Court rejected that defendant's argument that photo showups similar to those here prejudicially tainted his conviction. The court noted that the potentially prejudicial effect of the showup can be mitigated by cross-examination which shows the jury the method's potential for error. Defendant's counsel followed just such a course here.

from persons conversing at the crime scene because "I couldn't ask that question * * *. It would be prejudicial to [the defense attorney's] client." Defendant's objection to this comment was sustained. The State clarifies the context of this statement by pointing out that, in his closing argument, defendant's attorney had commented that "you don't know [what the testifying officer heard] because you haven't heard from one of the police officers who had those conversations. You don't know because you haven't heard from Jimmy Coston and Tommy Larry who were on the street at the time * * *."

■■ A defendant cannot complain that he has been prejudiced by remarks which have been invited or provoked by defense counsel. (*People v. Galloway* (1979), 74 Ill. App. 3d 624, 628, 393 N.E.2d 608.) On the other hand, here the comments went beyond explaining to the jury why the conversations were kept out of evidence. The reference to the prejudice to defendant in those statements interjected additional information which was not necessary to rebut the defense counsel's assertions, and which may have transformed the jury's inference into an assumption. (See, *e.g.*, *People v. Lopez* (1980), 89 Ill. App. 3d 456, 457, 411 N.E.2d 1071.) Given the court's quick action in sustaining defendant's objection, and in light of the fact that the comment did flow from remarks made by defense counsel which cast an unwarranted shadow on the State's evidence, we do not find that the comment warrants reversal of defendant's conviction. See, *e.g.*, *People v. Watson* (1981), 94 Ill. App. 3d 550, 559, 418 N.E.2d 1015.

## C.

During rebuttal, the assistant state's attorney told the jury that two of the witnesses (referring to Woods and Clark) had testified even though they were afraid because they had the courage to do so. Defendant's objection was immediately sustained.

■■ Examination of the record demonstrates that the only purpose of this comment could have been to defuse defense counsel's rhetorical question to the jury in his closing argument as to the failure of the State to call Clark's friend, Tommy Larry, who was also on the scene that night. Since defendant invited the State's comment by reflecting on the absence of Larry, he cannot now complain that it was made. *People v. Galloway*.

## D.

Finally, during rebuttal, the assistant state's attorney analogized defense counsel's closing argument to an octopus using its ink to obscure its escape. The prosecutor also said that a lot of what the defense counsel had related was untrue. Objections to these comments were denied.

■■ Analysis of the State's comments in conjunction with the defense

counsel's prior summation of his view of the evidence indicates that the State was not accusing the defense of trickery or of fabricating a defense. Rather, the comments were designed to point out to the jury that defense counsel's closing argument consisted largely of highlighting minor inconsistencies in the testimony of the State's witnesses. Additionally, the prosecutor's comment that defense counsel's statements were untrue is not an accusation that the latter lied. Rather, he merely argued that the defense misconstrued the evidence, and made no effort to assign wrongful intent to such misconstruction. There was no error in the State's actions. See *People v. Robinson* (1980), 91 Ill. App. 3d 1138, 1146-47, 415 N.E.2d 585; *People v. Lavoy* (1980), 91 Ill. App. 3d 639, 644, 415 N.E.2d 487; *People v. Johnson* (1979), 73 Ill. App. 3d 431, 434-35, 392 N.E.2d 587; *People v. Griggs* (1977), 51 Ill. App. 3d 224, 226, 366 N.E.2d 581, *appeal denied* (1977), 66 Ill. 2d 640.

## III

Defendant lastly asserts that the trial court erroneously sentenced him to an extended term.[3] Ill. Rev. Stat. 1979, ch. 38, pars. 1005—5—3.2(b), 1005—8—2.

In order to impose an extended term on a conviction, the trial court must find the presence of either one of two statutorily enumerated aggravating factors: that the felony conviction for which the sentence is to be entered followed within 10 years of the same defendant's conviction for the same or a greater class felony; or that the sentencing offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. In making its sentencing decision, the trial court noted that defendant's actions appeared to have been "needless and incredibly cold-blooded and cruel * * * exceptionally brutal behaviour [*sic*], * * * certainly henious [*sic*] and indicative of wanton cruelty." Defendant claims that "other than the shootings, nothing brutal or heinous occurred" and that the trial court thus had no basis for entering the extended term.[4] Defendant also argues the crime of murder cannot serve as the basis for an extended term since the "brutality" factor of the sentencing statute also is an element of the crime itself.

■■ Initially, we reject defendant's claim that the manner in which he murdered the Ewing brothers was neither brutal nor heinous. The evidence demonstrated that defendant gunned down three men, two of

[3] The extended term statute became effective February 1, 1978. Although it was not in effect at the time defendant committed the crimes, he elected, as was his option, to be sentenced under it.

[4] Defendant notes that the trial court relied upon other irrelevant factors (defendant's prior robbery conviction and the goal of deterrence) in entering the extended term sentence. We believe that the trial court correctly utilized the extended term provisions, as discussed above, despite its consideration of these irrelevant matters.

whom died, with no apparent justification. The record also shows that defendant pulled the trigger several times after he had emptied the gun of ammunition, and was thus apparently prevented from killing a third man only through his own lack of foresight. To characterize this action as if it was an everyday occurrence to which society's sense of outrage has become immune is ludicrous.[5] We find defendant's acts to be clearly indicative of wanton cruelty.

■■ Nonetheless, defendant claims that since murder requires an intent to do great bodily harm or to kill, this intent factor is identical to the aggravating factor and thus precludes entry of an extended term in murder cases. This assertion must be rejected. Surely a situation may be hypothecated in which a murder does not rise to the level of heinous or brutal acts. In such a case, a murder conviction could occur while an extended term would be precluded (if based upon the brutality factor). There is thus no inherent duplication in finding a defendant guilty of murder and in some cases finding his acts to warrant an extended sentence. Nothing in the cases cited by defendant, *People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906, and *People v. Brownell* (1980), 79 Ill. 2d 508, 404 N.E.2d 181, *cert. dismissed*, 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59, requires a contrary conclusion. The extended-term sentence was properly entered by the trial court.

For the preceding reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS and PERLIN, JJ., concur.

---

[5] In the words of Justice Trapp's dissent in *People v. Schlemm* (1980), 82 Ill. App. 3d 639, 652, 402 N.E.2d 810, *appeal denied* (1980), 81 Ill. 2d 598, *cert. denied* (1981), 449 U.S. 1127, 67 L. Ed. 2d 115, 101 S. Ct. 948, "[u]nless one is to accept the reputed methods of gangsters, the conduct is 'heinous'."